Ronald M. LANNER, Harriet E. Lanner, John A. Scherting, on behalf of themselves and all others similarly situated, Plaintiffs,

v. .

Joanne WIMMER, Thad Carlson, E. Malcolm Allred, Ronald S. Peterson, Maria Ellsworth, constituting the Board of Education for the City of Logan, Utah, James C. Blair, Superintendent of Schools for the City of Logan, Utah, Rulon C. Olsen, Principal, Logan High School, Logan, Utah, Sherman Hansen, Principal, Logan Junior High School, Logan, Utah, and their officers, employees, agents and assigns, and the Utah State Board of Education (Defendant in Intervention), Defendants.

Civ. No. NC 77–0025.

United States District Court, D. Utah, N. D.

Dec. 11, 1978.

---

Kathryn Collard, Stephen W. Cook, and Judith Romney Wolbach, on behalf of the American Civil Liberties Union, Salt Lake City, Utah, of counsel, for plaintiffs.

Arthur H. Nielsen and Clark R. Nielsen, of Nielsen, Henriod, Gottfredson & Peck, Salt Lake City, Utah, and David W. Sorenson, Logan, Utah, of counsel, for defendants.

Thomas C. Anderson, Asst. Atty. Gen., State of Utah, Salt Lake City, Utah, of counsel, for Utah State Board of Education, Defendant in Intervention.

## MEMORANDUM OPINION

BRIMMER, District Judge.

This case presents the question of whether the release-time program of Logan City, Utah, in which its public school students have long been permitted to attend church-operated seminaries for religious instruction during regular school hours, violates the well-established guidelines developed by the Supreme Court concerning the meaning of the Establishment of Religion and Free Exercise Clauses of our Constitution. We echo the words of the Tenth Circuit's own Judge Alfred P. Murrah who observed in *Anderson v. Salt Lake City Corporation*, 475 F.2d 29 (10th Cir. 1973) that little we can now say concerning the scope and effect of these clauses, can add to what has been so prolifically said elsewhere. This is not a new question. Justice Potter Stewart observes in *Meek v. Pittenger*, 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed. 217 (1975) that over the past decades the Supreme Court has developed, as guidelines, tests with which to identify instances where the objectives of the Establishment Clause have been impaired. The broad Constitutional contours of this field are well-defined. Each such case must then be determined by analysis of its facts, measuring the degree to which it falls within the permitted parameters of that field.

The Plaintiffs are citizens and taxpayers of Logan City, Utah, and are the parents of children who either are attending, have attended, or will attend Logan Junior High School and Logan High School, while the Defendants, Joanne Wimmer, Thad Carlson, Ronald S. Peterson, Maria Ellsworth and E. Malcolm Allred, are members of the Board of Education for the Logan City School District, which is responsible for operating and maintaining the public schools and the Defendant, James C. Blair, is the superintendent of schools for the Logan City School District and the Defendants, Rulon C. Olsen and Sherman Hansen, are the respective principals of Logan High School and Logan Junior High School. The Defendant in Intervention, the Utah State Board of Education, is a state agency operating pursuant to § 53–2–1, et seq., Utah Code Annotated (1953), as amended, which is vested with the general control and supervision of the public school system in the State of Utah. All of the Defendants were sued in their official capacities.

### Description of the Release-Time Program

For more than 30 years prior to the commencement of this action, the policy of the Utah State Board of Education (State Board) has permitted students in the ninth through the twelfth grades, upon written request of their parents, to be released one hour per day during school hours for the purpose of receiving religious instruction in regularly sponsored and maintained programs, generally referred to as release-time programs. In accordance with this policy, students of Logan High School and the ninth grade students at Logan Junior High School are released for one class period each day during the school week to participate in a program of instruction offered by the Church of Jesus Christ of Latter-Day Saints (LDS Church). Students also may be released upon the same terms to participate in a rather sparsely attended release-time program of instruction in the Old Testament and New Testament, sponsored by several Protestant churches and held in the Presbyterian Church, about one block from the high school. Since the course-content of that program was not questioned, we must set to one side the question of the legality of that program, although it will be generally affected by the conclusions herein.

Not less than two-thirds of the students enrolled at the Logan Junior and Senior High Schools have participated in the LDS release-time program during each of the last five school years. Approximately ninety-five percent (95%) of those students participating were members of the LDS Church. The junior and senior high school release-time programs are conducted in buildings owned, maintained and operated by the LDS Church and which are respectively located adjacent to the Logan Junior High School and Logan Senior High School, which are the only public secondary schools

in the city. Each of the two seminary buildings are nearly identical in architectural appearance, style, and color of brick to the adjacent public school building, to which they are connected by grass lawns and sidewalks, or a parking lot, unbroken by streets. The seminary buildings have no fences or other physical barriers surrounding them, but they are designated as such by clearly visible but unobtrusive exterior signs. Students walk freely, unescorted, to and from their classes in the public school buildings and the seminary classrooms.

No LDS seminary class or activity is held or carried on in a public school building, and no public funds or resources are used to aid the release-time seminary program, except for some daily attendance forms, the cost of which is negligible. All costs of the seminary program, other than those paid by the students, are borne by the LDS Church, which maintains the seminary buildings and grounds, including repair, maintenance, custodial services, sprinkling and mowing of lawns, and removal of snow.

The LDS release-time program consists of four courses "Book of Mormon", "Old Testament", "New Testament", and "Church History and Doctrine." The Logan Senior Seminary and the Logan Junior Seminary have taught one of these courses each year in that sequence. Logan High School recognizes two units of credit toward graduation for the successful completion of the Old Testament and New Testament courses. Credit for those courses may not be given to fulfill any of the State Board's required seven and one-half credit hours of designated subjects. However, credit for the Old Testament and New Testament courses is accepted in satisfaction of the seven and one-half elective credits which comprise the remainder of the 15 units of study required by the Utah State Board of Education for graduation from high school. Logan High School requires 16 units of academic credit for graduation during the 10th, 11th and 12th years of high school, with 8 of those credit units to be in required instruction area. A "contact" unit of credit is given, without consideration being given to the nature of the course, for

each course taught during the entire year 5 days a week with a 50 minute class period.

Credit for Bible history may be counted as an "elective" but may not fill any obligations for required instruction in the fields of social studies, science, English or literature. No credit is given for any of the release-time courses taken in junior high. A student must complete all four of the release-time courses in order to graduate from the LDS Seminary, which requires the taking of one course at the junior high school level.

The curriculum and course materials utilized in the four release-time classes have been developed, published and provided by the Church Education Division of the LDS Church, as part of an LDS Church Education System which provides a program of religious education to approximately 200,000 high school age students in over 60 countries. About 50,000 of them receive that instruction where credit for Bible study is transferred from the seminary to the public school.

Teachers in the seminaries are required to be members of the LDS Church and are selected and employed by the Church's education division. Full-time instructors must meet the professional and educational qualifications required by the State of Utah for public teachers at the high school level and must have and maintain a teaching certificate from the State of Utah. There are 6 full-time and 1 half-time teachers in the high school seminary and 2 full-time teachers in the junior high seminary. Students enrolled in the program pay a small annual fee for study materials, which include a Bible, looseleaf binder and handouts selected by the teacher but all other costs incurred by the release-time program are paid by the LDS Church. None of the program's costs are paid by public school revenues.

Because of the cost of printing (the LDS Church spends between one and two million dollars to produce materials for each course), only one set of materials has been produced. It is used both in seminaries from which credit is accepted on transfer to public schools and in seminaries where no

credit is expected to be received, including early morning and home study programs. Such course materials and aids are thus distributed to the seminary instructors throughout the United States and foreign countries without regard to local needs or requirements. In the front of the New Testament teacher's outline in bold red type is the caveat: "Many school districts in the United States allow transfer credit for courses in Bible history and literature. In such jurisdictions the course materials presented should be in harmony with both the letter and the spirit of the rules and regulations governing transfer credit and school graduation. Teachers are directed to use care in the use of the subject matter presented herein to the end that all classroom instruction is in accord with local requirements." Although the seminary teachers are counseled to teach in a nondenominational manner, many of them follow the teacher's course manuals as printed, without deletion of the sectarian or denominational references contained therein.

*Administration of the Release Time Program and Integration Between Schools*

Registration at Logan Senior High School and Junior High School occurs in the spring preceding the school year in which the classes are to be taken. Although differing in many respects, registration for the release-time program is generally similar. Each student completes and returns to the high school or junior high a pre-registration form or class schedule. If such student desires to attend seminary he or she indicates such a desire by requesting released time on the pre-registration form. The students or their parents are furnished forms by the seminary or ecclesiastical officers of the L.D.S. Church, on which parents may request permission from the school to have their children released for one period during the school-day throughout the school year to take a course at the L.D.S. seminary. Those forms are then returned to the seminary which in turn forwards them to the high school or the junior high. The slips are checked by the public schools to insure that there is a completed form for each

student who has requested release-time for participation in the L.D.S. Seminary Program. The permission slips are kept on file for approximately 3 years. Schedules for classes, school catalogues and registration forms at Logan High School do not contain any schedules of release-time classes. However, the pre-registration for students of Logan Junior High School lists "Release Time" as a course option. Registration for the release-time programs in the junior and senior high schools differs significantly in one respect. The Logan Junior High School officials do not permit the student to determine which hour of the day the student will be excused but make such determination themselves so as to maintain better control over the student program. The senior high students are responsible for designating the hour they wish to be released on their final submitted class schedule. Thus, registration for release-time classes regularly occurs off the public school premises, on forms supplied by the seminaries, and by personnel employed or engaged by that institution. Although at least one member of the LDS seminary staff or faculty was present at Logan High School during registration in 1976, this incident appears to be isolated and it is not now the practice of release-time personnel to be present and assist at the public schools' registration.

The high school and junior high school each make a daily attendance check of all students enrolled in each school. The attendance slips for each class are collected by a student who participates in an office practice class and who personally visits each classroom and obtains a list of those students who are absent from class. A similar check is made of those students attending LDS seminary by picking up a list, on a form furnished by the public school, of those students absent from seminary class. If students are repeatedly absent from regular school classes or seminary classes, their parents are contacted by public school personnel, in order to maintain overall discipline and be apprised of the whereabouts of its students; but parents are not contacted by public school officials merely to report

absences from Seminary. Attendance is not reported on any permanent record but absences appear on the students' administrative records which are stored in school files for several years.

The high school records a student's grade in the Old and New Testament courses on his or her permanent records. Since credit is not given for any classes taken in the ninth grade no such procedure is followed in the junior high schools. Neither the seminary grade nor attendance record is recorded on a student's public school report card.

Each of the public school buildings is equipped with a public address system over which announcements are made to the students and a bell system which rings to denote the beginning and ending of each class period. The LDS seminaries have an attachment to the public address systems so that announcements in the junior high school or senior high school as well as the class bells can be heard in the Seminary buildings. However, no announcements can be made from the seminary into the school system nor is the seminary permitted to make any announcement over the school system. The cost of installation and maintenance of the public address system extensions has been paid by the seminaries.

Teachers in the LDS programs hold parent-teacher conferences in the seminary buildings on the same dates and times as such conferences are held by the teachers in the public schools. It appears that this is done as a matter of convenience and accommodation for the public and all concerned rather than by specific prearrangement between the school officials and Seminary personnel.

At both the junior and senior high schools the LDS seminary has access during school hours to a box in which notices are placed regarding school programs or changes in school schedules, which may affect the daily routine of the public schools. The seminary may then adjust its schedule to accommodate the school and student by permitting the public school to preempt the time for which a student is otherwise released. Any mail addressed to the seminary which is mistakenly delivered to the school is also placed in the box rather than being returned to the post office.

The seminary facultymen, as members of the general public, are requested from time to time to assist in public school activities such as taking tickets at school events, handling line markers at football games, and timing events in track meets. Release-time personnel are also allowed to eat in the junior or senior high school cafeterias, as are any of the citizens of Logan City, but seminary staff and faculty who utilize the cafeteria are required to pay for their meals at the standard rate for the public.

Senior students at the high school are permitted to list their extracurricular or other activities in the annual yearbook, including their participating in seminary. This reference to seminary is neither sanctioned nor encouraged by the school, but is left to the discretion of the students. Many of the other activities listed in the yearbook by the students are unrelated to school functions.

The Logan City School Board's rules require that students in the junior high school be accounted for during regular school hours each day and be enrolled in seven (7) class periods per day unless released at the request of the parents to attend L.D.S. Seminary. Students in the senior high school are eligible to participate in interschool activities, honor roll and student body elections only if they are attending six (6) class periods per day. Enrollment in any of the four release-time courses is accepted by the school as a class period in partial fulfillment of that requirement.

The junior and senior high schools receive from the State public funds for their operation and maintenance, based upon the number of students in attendance each day. In order to be counted for the purpose of receipt of state funds by a school, a student must attend four (4) class periods of the day. Attendance in any of the release-time courses by a student is not necessarily counted as "attending" for the purpose of determining entitlement to state funds, but the method used in the past for counting at-

tendance resulted in counting such release-time attendance.

Other contacts between the public school and the seminary which have occurred in recent years include: the offering of a prayer by a seminary official at a school function; voting and collecting votes by the student body for public school elections during seminary class; references to seminary activities in the student paper; the appointment of a seminary faculty member to serve on a public school committee; and the use of seminary classes as homerooms for the public school. These activities, however, were either isolated events or were discontinued prior to the initiation of this suit.

### The Release-Time Program

The Utah State Board of Education in 1969 adopted the following policy:

Credits for work taken in release time classes should be recognized by public schools only upon an official transcript of credits from the institution conducting such classes and upon evaluation on the same basis that similar credits from established private high schools are evaluated (the State Board has authorized high schools to recognize not to exceed two units of Bible History for work taken in private seminaries or schools. Such credit may be counted as elective but may not fill any requirements in the fields of social science, English or literature.) *No credit is to be given for courses devoted mainly to denominational instruction.* (Emphasis supplied)

The release-time courses entitled "Book of Mormon" and "Church History and Doctrine" are admittedly sectarian in nature. No credit is granted for their completion and no factual dispute exists as to their content.

The Old Testament and New Testament classes, for which credit is given, are described by the Defendants as having a basic purpose of acquainting the student with the contents and teachings of the Bible so that the students may apply those teachings in their personal lives. Events recorded in the Bible, which are remote to present day high school students, are made contemporary by modern frames of reference and illustrated or emphasized by statements principally of LDS authorities who are respected by members of the LDS Church and whose counsel and advice the students would be expected to follow. The Bible courses are also a familiarization with the contents and books of the Bible in a canonical and chronological order. Biblical stories are very effectively and properly used to bring out better traits of character and to teach students good citizenship, morality, honesty, integrity and other worthwhile social virtues.

The release-time classes usually open with a prayer, followed by a devotional service which might include the singing of a hymn or the presentation of a religious thought or message. During the course of the Old Testament and New Testament classes seminary teachers are encouraged by their teacher's instruction manuals to give a personal testimony of faith concerning the truthfulness of the Bible, and students may be encouraged to give their own testimony during class.

The Old Testament and New Testament courses are essentially religious in nature. The King James version of the Bible, which is the basic textbook for the courses, is of course, inherently religious. While it records the relationship of ancient peoples to God, it also expresses concepts of faith in God. The instructors encourage the students to believe that the Bible is true and teach them how to apply the Bible in their daily lives. But, in addition to their studies of the scriptures and the various books of the Bible in the accredited courses, students are also taught about numerous LDS beliefs and practices, including temple marriage, missionary work, restoration of the Church to Joseph Smith, baptism for the dead, and abstinence from tobacco and alcohol.

The overall L.D.S. education program is directed to high school students as well as those students attending college. The education program in the high schools is denominated "Seminary" while the educational program at the college level is denomi-

nated "institute." A substantially enlarged program of education is offered at the college level. The "Seminaries and Institute of Religious Handbook," which was utilized in the training of release-time teachers in 1973, set forth the purposes of the total eight (8) year course of study as follows:

## BASIC PURPOSE AND OBJECTIVES OF THE PROGRAM

"The basic purpose of seminary and institute work is to help students achieve "eternal life." Its immediate responsibility is to help them live in harmony with the principles and purposes of the gospel of Jesus Christ that they may experience the joy that follows."

President David O. McKay has stated: Leading youth to know God, to have faith in his laws, to have confidence in his Fatherhood, and to find solace and peace in his love—this is the greatest privilege of the Church school teacher.

The eight year program has the following objectives:

1. To help students achieve a real and meaningful testimony that God lives, that Jesus is the Christ, and that Joseph Smith is a prophet of God.
2. To help students increase in faith and testimony of the restored gospel and in the divine origin of the Church of Jesus Christ of Latter-day Saints.
3. To help students gain a fundamental and integrated knowledge of the whole field of religion and man's attempt to find and understand God and his purposes.
4. To help students apply the principles and spirit of the gospel in every walk of life; in friendship, courtship, marriage, and family life; in study, work, and politics; and in church and community life.
5. To help students increase in their love for the Church and in their ability to render effective leadership and service.

6. To help students relate their growing understanding of the gospel to their continued study and thinking in academic fields, that they might learn to combine successfully a thoughtful appraisal of life with a firm and meaningful faith in the gospel.
7. To help students feel a growing sense of responsibility toward the community, the nation, and the world and to inspire them to utilize their faith, knowledge, and skills to be more effective and devoted citizens.
8. To help students recognize their great potential as children of God; to achieve maturity in their personal adjustments, self-understanding and self-acceptance, and in their ability for creative living.
9. To guide students to an understanding of the meaning and purpose of temple marriage and to develop in them the desire to pattern their courtship, marriage, and family life to the high ideals and commitments of the temple.
10. To arouse in students the spirit of missionary work and to help them prepare in both mind and spirit for effective and honorable service in the mission field.
11. To help students increase in the appreciation of all the spiritual values of life and in excellence in all worthwhile endeavors.

Of course, these objectives relate to the entire L.D.S. educational program, which at the institutional level includes numerous courses for which no credit is recognized in the high schools.

The Plaintiffs seek injunctive relief against the Defendants for their alleged maintenance and operation of the LDS release time program as part of the regular school program at Logan Junior and Senior High Schools, contending that the LDS release-time program constitutes a *per se* violation of the United States Constitution and the corresponding provisions of the Consti-

tution of Utah; they assert in the alternative, that the LDS release-program violates the "establishment" and "free exercise" clauses of the First Amendment to the Constitution and the parallel provisions of the Utah Constitution, and finally challenge the constitutionality of the State Board's policy which grants credit for Bible History courses so long as the classes are not "primarily denominational" in nature—all of which Defendants deny, urging that this Court should refuse to inquire into the denominational or non-denominational nature of the Bible course. But, should the Court choose to do so, the Defendants maintain that the accredited classes are not "mainly denominational."

The Plaintiffs have claimed to represent all members of a similarly situated class and sought to have the Court certify this matter as a class action under Rule 23 of the Federal Rules of Civil Procedure. It is the conclusion of the Court that the prerequisites set forth in Rule 23(a)(1), (2) and (4) have been satisfied and that a class action would be proper only insofar as it encompasses present and future students of Logan High School and Logan Junior High School.

■ The Defendants also assert that the Plaintiffs are not the real parties in interest but rather that the real party in interest is the American Civil Liberties Union (ACLU), which lacks the standing necessary to maintain this action. While it is true that ACLU lawyers represent the Plaintiffs and that the Lanners are members of the ACLU, it is equally evident that the Plaintiffs' children have attended, are attending, or will attend the Logan City secondary schools and that the Plaintiffs are residents of and taxpayers of Logan City, Utah. Where the named Plaintiffs have a legally enforceable right and have alleged a deprivation of that right, this Court, without significant evidence to the contrary, will not assume that others not so named are the real parties in interest.

I.

The Plaintiffs assert that the release time program results in a *per se* violation of the Establishment Clause of the First Amendment to the Constitution.

It has been observed that the release-time program in itself has never been held to be in contravention of the doctrine of separation of church and state, but that it is the manner in which it has been practised that has constituted a violation. *Perry v. School District No. 81*, 54 Wash.2d 886, 349 P.2d 1036, 1040 (1959). The United States Supreme Court first considered the release-time question in *McCollum v. Board of Education*, 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649 (1948), where a release-time program was held to be unconstitutional because the religious classes were held in public school buildings. Students not taking part in the program had to go to other rooms in the school to pursue their secular studies. The Court held that the program afforded "sectarian groups an invaluable aid in that it helps to provide pupils for their religious classes through use of the states compulsory public school machinery."

Four years later in *Zorach v. Clauson*, 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952), the Supreme Court found that a New York release-time program was constitutionally permissible. The program in *Zorach* provided that public schools could release students from classes during the school day so that they could leave school grounds and attend devotional exercises or religious instruction classes at religious centers. The churches made weekly reports of attendance to the public schools and all costs including application blanks were paid by the religious organizations. The Court concluded that this did not constitute an establishment of religion, but rather was a mere accommodation between church and state.

The authority of *Zorach* is challenged by Plaintiffs in view of the Supreme Court's more recent holdings regarding the Establishment Clause. In *Lemon v. Kurtzman*, 403 U.S. 602, 612, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), Chief Justice Burger set forth this three-pronged test to determine whether a state law or program results in an establishment of religion: First, a constitu-

tional law must reflect a clearly secular legislative purpose; Second, it must have a primary effect that neither advances nor inhibits religion; and, Third, it must avoid excessive government entanglement with religion. This test is the guideline referred to in the 1975 case of *Meek v. Pittenger*, supra, and is the "now well-defined three-part test that has emerged from our decisions" described in the 1973 case of *Committee for Public Education & Religious Liberty v. Nyquist*, 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed. 948, 962, which the Supreme Court said that to pass muster under the Establishment Clause a law must meet.

Plaintiffs assert that the Logan release-time program fails all three parts of that test. We disagree. The *Zorach* case, the continuing validity of which the Plaintiffs challenge, was cited with approval in both of these very holdings which promulgate the three-part test. Justice Stewart in *Meek v. Pittenger*, supra, 421 U.S. at 359, 95 S.Ct. at 1760, did so in these words:

"But it is clear that not all legislative programs that provide indirect or incidental benefit to a religious institution are prohibited. *Zorach v. Clauson*, supra, 343 U.S. 306, [312, 72 S.Ct. 679, 683, 96 L.Ed. 954.]"

In *Smith v. Smith*, 523 F.2d 121, 124 (4th Cir. 1975), another release-time case, it was similarly urged that *Zorach*, supra, had been undermined by the three-part test set forth in *Lemon v. Kurtzman*, supra, but that Court rejected the argument, relying upon the *Meek* holding and noting that *Zorach*, supra, is not inconsistent with but rather illuminates the tripartite test. We concur in that analysis.

Applying the three-part test, the secular legislative purpose of a release-time program is to accommodate the public in its spiritual needs. The Constitution does not require the government to show a callous and indifference to religion. *Zorach v. Clauson*, supra, 343 U.S. at 314, 72 S.Ct. 679. Thus, this program satisfies the first part of the test.

The second element of the test is also satisfied. The Supreme Court's opinion in *Meek* must be understood as holding that the primary purpose of a release-time program must not either advance or inhibit religion. In *Smith* the Court observed that the release-time program considered there and in *Zorach* must be seen as having a primary effect which is simply the innocuous diminution of the number of children in school at a certain time of day. *Smith v. Smith*, supra, 125. While Justice Black in *McCollum*, supra, in 1948, called for a "high and impregnable" wall of separation between Church and State, leaving each free from the other within its respective sphere, Justice Powell observes in *Committee for Public Education v. Nyquist*, supra, that "this Nation's history has not been one of entirely sanitized separation between Church and State." He also notes, we think correctly, that Jefferson's metaphoric wall of separation between Church and State has not become as winding as the famous serpentine wall he designed for the University of Virginia, because it has never been thought possible or desirable to design a system of total separation. Chief Justice Burger in *Lemon v. Kurtz*, supra, said, "Our prior holdings do not call for total separation between Church and State" and called for "close scrutiny of the degree of entanglement involved in the relationship" to prevent the intrusion of either into the sphere of the other.

There is no constitutional mandate requiring governments to be hostile to religion. *Zorach v. Clauson*, supra, 343 U.S. 314, 72 S.Ct. 679. The breadth of involvement and the influence in the affairs and lives of this country by the various governmental bodies and religious organizations has inevitably resulted in some relationship between church and state. Exemptions of church-owned property from ad valorem taxation, provision of chaplains for armed services at government expense, fire inspections and building and zoning regulations, and compulsory school-attendance laws are a few examples of permissible relationships. The problem is one of degree. The Court in *Zorach*, supra, recognized this:

878

We are a religious people whose institutions presuppose a Supreme Being. We guarantee the freedom to worship as one chooses. We make room for as wide a variety of beliefs and creeds as the spiritual needs of man deem necessary. We sponsor an attitude on the part of government that shows no partiality to any one group and that lets each flourish according to the zeal of its adherents and the appeal of its dogma. When the state encourages religious instruction or cooperates with religious authorities by adjusting the schedule of public events to sectarian needs, it follows the best of our traditions. For it then respects the religious nature of our people and accommodates the public service to their spiritual needs. To hold that it may not, would be to find in the Constitution a requirement that the government show a callous indifference to religious groups. That would be preferring those who believe in no religion over those who do believe. Government may not finance religious groups nor undertake religious instruction nor blend secular and sectarian education nor use secular institutions to force one or some religion on any person. *But we find no constitutional requirement which makes it necessary for government to be hostile to religion and to throw its weight against efforts to widen the effective scope of religious influence.* The government must be neutral when it comes to competition between sects. It may not thrust any sect on any person. It may not make a religious observance compulsory. It may not coerce any one to attend church, to observe a religious holiday, or to take religious instruction. But it can close its doors or suspend its operations as to those who want to repair to their religious sanctuary for worship or instruction. *Zorach v. Clauson*, supra, 343 U.S. 313–314, 72 S.Ct. 684. (Emphasis Supplied).

A release-time program does not necessarily result in excessive government entanglements. The theological instruction programs approved in both *Smith* and *Zorach* involved little, if any, contact between the public school and religious institutions. Therefore, we believe that a release-time program does not constitute a *per se* violation of the establishment Clause of the First Amendment.

## II.

The Plaintiffs further contend that the LDS release-time program infringes upon their own rights to the free exercise of religion, due to its inherently coercive effect upon students to attend seminary, claiming that both they and their children are subjected to community social pressures resulting in their segregation and isolation because of their lack of participation in the program. No suggestion is made that the Defendants, or the authorities of either seminary or public school, have used any coercion to force unwilling students into seminary classes. On the contrary, the public school doors remain open for classes for non-seminary students. The program is conducted without a noticeable effect on the remainder of the students. Neither is a student forced to enroll in release-time instruction. The evidence is clear that Defendants simply release at given hours throughout the school-day those students who wish to participate in the seminary program, while the non-seminary students are left to their own desires as to the manner and time of their religious devotions, if any. *Zorach v. Clauson*, supra, 343 U.S. 311, 72 S.Ct. 679.

The most that can be said for the Plaintiffs' free exercise claim is the possibility of peer pressure to become involved in the LDS program or church from others in the community or from their childrens' fellow students. This is quite different than claims of exertion of similar pressure by the Defendants. Nothing in the evidence indicates that any constraints have been placed on the Plaintiffs by the Defendants, or that such peer-pressure constraints would be eliminated by the absence of the seminary program. The existence of certain social pressures and the partial segregation of non-members of a particular church are not unexpected in a geographical area inhabited

by a population predominantly of one religious persuasion, such as Logan City. In the absence of any showing of coercion by the Defendants or by the seminary program which results in an obstacle to the practice of the Plaintiffs' own religion, this Court cannot find that the Plaintiffs' rights under the Free Exercise Clause have been denied. *Board of Education v. Allen*, 392 U.S. 236, 248–249, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968).

### III.

The Plaintiffs contend that certain aspects of the release-time program, principally, the granting of state credit for the Old and New Testament courses, are violative of the Establishment Clause of the First Amendment. The Court has reviewed with care the content of these courses, and the seminary program. We find that the aims and objectives of the program—its development of character, faith, integrity, and industry in the youth of the LDS Church—are most laudable and praiseworthy. We admire the deep sense of good citizenship and responsible concern for inculcation of such necessary values in their youth that has inspired the leaders of the LDS Church to strive to indelibly impress those virtues in the minds of young people. The program is good and fine, but unfortunately it is Constitutionally flawed. The granting of credit at the high school level for the Old Testament and New Testament courses cannot pass the second element of the *Lemon v. Kurtzman* test, because that advances the cause of religion. These two Bible study classes are religious and sectarian in nature. They are not planned and taught from a strictly historical, literary or comparative view-point, but are geared toward reinforcing LDS beliefs. In short, they are a blend of secular and sectarian education for which credit cannot be given through a public high school system.

The Director of the Church Education Division of the LDS Church testified that previously enumerated objectives set forth in the "Seminaries and Institutes of Religion Handbook" were applicable to the Old and New Testament classes. These objectives unmistakenly demonstrate the religious and sectarian goals to be achieved in the program. Examination into the nature of the classroom studies discloses devotional services and prayers participated in by the students as well as the active teaching of LDS convictions and the baring of testimony by both students and teachers.

While they could not testify as to what material was actually taught in the classes, the expert witnesses in the field of religion generally agreed that the study aids and other materials used in the Old Testament and New Testament classes were essentially religious and sectarian or denominational in nature. They are directed to teaching the students faith and belief in specific religious concepts, beliefs and practices and are supportive of the religious views of the LDS Church. Dr. Lewis Max Rogers, a professor of Philosophy of Religion, at the University of Utah, a life-long member of the LDS Church and himself a former LDS release-time teacher, testified that at the University of Utah he was able to teach the Bible as history and as literature, without sectarianism, but that the materials utilized in teaching these Old Testament and New Testament courses were concerned primarily with the advocacy of the religious beliefs and practices of the LDS Church, with the exception of occasional references to geographical data, and that none of the materials used in the two accredited courses were inconsistent with the LDS doctrine and the Church's "Articles of Faith" which include: a belief in the corporeal nature of God, baptism for the dead, marriage for time and eternity, man's existence in a pre-mortal world with God, and belief in a heavenly mother. Dr. Rogers further testified that the "Approved Scriptures" referred to in the teaching materials for the Bible history courses were not simply selected at random but were specifically chosen in furtherance of LDS beliefs. It was his opinion that a course in the Bible could be taught by letting the Bible "speak for itself," but that instead the emphasis of these Old Testament and New Testament courses is to illustrate to the students how to deal with

contemporary problems through application of the tenets of the LDS Church and that Church's interpretation of the Bible. Thus, Dr. Rogers concluded that for students in the two accredited courses the Biblical text is interpreted by the teachers through the medium of LDS church doctrine and its understanding of the Bible.

A review of the many exhibits in evidence confirms these views of Dr. Rogers and the similar testimony of the other expert witnesses. For example, the "Tom Trails" filmstrip series which is utilized in the New Testament class and which was used in teaching the course, concerns an Indian boy who converts to the LDS faith and is able to solve the various problems he encounters through the practice of LDS beliefs and teachings.

Defendants contend that the clear purpose of the course materials is to teach the lessons of the Bible and that the seminary teachers are warned not to teach sectarian matters. But the testimony of at least one or more of the teachers indicates that they followed the teachers' manual. The students' course materials show this, too. Seminaries, which are deeply involved in the dissemination of religious and sectarian precepts, are powerful instruments for transmitting the doctrines of a particular religious faith. *Lemon v. Kurtzman*, supra. We must recognize, as did Chief Justice Burger, that "a dedicated religious person, teaching in a school affiliated with his or her faith and operated to inculcate its tenets, will inevitably experience great difficulty in remaining religiously neutral." *Lemon v. Kurtzman*, supra. This is not to accuse the fine, dedicated seminary personnel of any violation of their instructions or mandates, but merely to observe that, "With the best of intentions such a teacher would find it hard to make a total separation between secular teaching and religious doctrine." *Ibid.* Neither do we assume that the seminary teachers will be unsuccessful in segregating their religious beliefs from their secular educational responsibilities in teaching such courses. But, as Justice Burger emphasizes, "the *potential* for impermissible fostering of religion is present. The conflict of functions is obvious and its result is the inevitable failure to separate secular instruction and sectarian doctrine." *Ibid.* That is what our courts have forbidden.

It is also urged that Bible courses must be religious, because that study is in itself of religious writings, but that the courses are not necessarily sectarian or denominational. The opinions of the religion experts of both parties as to the denominational or sectarian content of these courses varied from that of the Defendants' Dr. Joseph Bellah who said only 20% of the courses' content was LDS in nature to that of the Plaintiffs' Rev. William Simmons, who said that content was more than 50% of the courses and that the Defendants' Dr. J. Jermain Bodine, of the Hartford Seminary Foundation, who said that in their totality the course materials are mainly denominational, but would not be if taught in keeping with the caveat at the front of the course materials. Although these courses do indeed teach concepts of morality, integrity, character and good citizenship by reference to Bible stories, which is surely a legitimate method of teaching the Bible, there is nevertheless in these courses a blend of secularism with sectarianism, and that is forbidden by all of the decided cases, including *Zorach* on which the Defendants have relied. The degree of the forbidden mix does not matter; the Supreme Court has forbidden any mix at all.

■ The Establishment Clause prohibits sponsorship, financial support or active involvement by the sovereign (here the school district) in religious activity. *Lemon v. Kurtzman*, supra, 403 U.S. 612, 91 S.Ct. 2105, 29 L.Ed.2d 745; *Walz v. Tax Commission*, 397 U.S. 664, 668, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970); *Meek v. Pettinger*, 421 U.S. supra at 359, 95 S.Ct. at 1753. *Committee for Public Education v. Nyquist*, 413 U.S. 756, 771, 93 S.Ct. 2955 (1973). The state is required to maintain an attitude of neutrality toward religion. *Committee for Public Education v. Nyquist*, supra, 788, 93 S.Ct. 2955; *Anderson v. Salt Lake City Corporation*, supra at 34.

Our courts having mandated bounds of absolute neutrality in matters of religion for the public school, no plausible secular purpose can be served by accreditation of classes that are both religious and sectarian in nature. Also, the academic recognition awarded for completion of the Bible history courses by the granting of public high school credit may have an effect of advancing and sponsoring religion by indirectly encouraging students to participate in the program. The mandated bounds of neutrality thus are exceeded, and the granting of credit for such Old Testament and New Testament courses becomes constitutionally impermissible.

■ The potential for excessive entanglements between church and state is also present. The public school policy of granting credit for those courses which are not "mainly denominational" presupposes that there must be monitoring by the public school authorities to insure that the classes do not become sectarian in nature. Admittedly, the Defendant boards have not engaged in any overseeing of the Old Testament and New Testament classes and have thus far avoided the possible entanglements. In fact, they have granted credit for such courses upon presentation of certified transcripts, without inquiry of any kind relative to the course content. It would seem imperative that the public school authorities must engage in some inquiry or surveillance of the release-time courses to ensure that neither the course materials nor the teachers were in violation of the state policy or the First Amendment. *Lemon v. Kurtzman*, supra, 403 U.S. at 619, 91 S.Ct. 2105; *New York v. Cathedral Academy*, 434 U.S. 125, 130, 98 S.Ct. 340, 345, 54 L.Ed.2d 346, 353 (1977).

But, that confronts the Defendants with this dilemma: Either granting credit for unmonitored release-time courses, which may result in the advancement or sponsorship of religion; or becoming excessively entangled with the surveillance of seminary classes. While here the school board and the seminary's administration are not unsympathetic or hostile toward each other, it takes little imagination to envisage a State board or a local school board of different sympathies attempting to dictate what seminaries may teach under the guise of monitoring these programs. That would be intolerable. Where the public school recognizes academic achievement for the completion of non-denominational classes taken in sectarian institutions, there is an inherent antagonism between the requirement of not advancing religion and that of not fostering an excessive entanglement with religion.

The Defendants contend that the granting of release-time credit is no different than the acceptance of transfer credit from parochial or other private schools. The argument fails for several reasons. First, the Bible history classes are merely elective courses for the public school students, which are by the granting of credit indirectly sponsored by the public school system. The parochial school educational system is left by the State to operate strictly within its own sphere. Thus, the transfer of credit by a parochial school student is generally for the purpose of shifting his attendance to the public schools, and there has been no active state sponsorship of religion. Secondly, to require a former parochial school student who wishes to finish his senior year in high school in the public school system to start his education anew without transfer credits rather than to accept transfer credits, would be intolerable. In the case at bar, there is much more than a passive recognition of and incidental benefit to a parochial school but rather an active, although perhaps unintentional, sponsorship of religious and denominational classes by the public school system.

■■ The Plaintiffs have also requested the Court specifically to declare unconstitutional the State Board policy permitting accreditation of Bible history courses, but the Defendants assert that we should abstain from deciding the constitutionality or applicability of the State Board's policy. Abstention by a Federal Court is proper: (1) to avoid decision of a federal constitutional question where the case may be disposed of on a question of state law; (2) to

avoid needless conflict with the administration by a state of its own affairs; and (3) to leave to the States the resolution of unsettled questions of state law. *Wright*, Laws of Federal Courts 3rd, p. 218 (1976). None of this abstention doctrine applies here. The constitutionality of the State Board's policy has been made a central issue in this case by the Defendants' reliance thereon in justification of the award of credit for Bible history courses. It does not appear that any construction of this policy, regardless of the forum, can avoid a determination of its validity under the Establishment Clause. Thus, no needless conflict with the administration of the affairs of the State of Utah would occur as the result of a ruling of this Court. It further does not appear that any state action is now pending that would resolve the issue presently before this Court.

"Abstention from the exercise of federal jurisdiction is the exception, not the rule. . . . 'Abdication of the obligation to decide cases can be justified under this doctrine only in the exceptional circumstances where the order to the parties to repair to the state court would clearly secure an important countervailing interest.' " *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976).

The claim asserted by the Plaintiffs raises a basic First Amendment question, of which this Court has jurisdiction under 28 U.S.C. §§ 1331, 1343, 2201, 2202 and 42 U.S.C. §§ 1981, 1983 and 1985, and the Constitution of the United States and the First and Fourteenth Amendments thereto. A proper resolution of that claim is not conditioned upon the resolution of any state question, law or constitution. *Anderson v. Salt Lake City Corporation*, supra.

The Defendants, having in effect elevated the seminary Bible courses to the status of an elective class at Logan High School, must assume responsibility for its course content. The State Board's policy implies as much. The Old Testament and New Testament courses could not be turned over to the exclusive control of the seminary without some expectation that they may become religious and sectarian in nature, and whether these two accredited courses of instruction are termed largely denominational or only partly denominational, they still have an effect of advancing religion. If the Defendants were to engage in a continuing surveillance of the release-time classes, to insure respect of the First Amendment, the public school authorities would then become excessively entangled with church affairs. The policy can fare no better than the practice of it. The granting of academic credit for these courses cannot therefore be justified.

## IV.

■ The Plaintiffs finally assert that the various administrative features and school-seminary interrelationships are constitutionally impermissible. It is true that there is some integration between the public schools and the seminaries, although it is not as extensive or flagrant as contended. The majority of these incidents or activities were either isolated, discontinued or innocuous accommodations of church and state, or non-reoccurring events, none of which represent an on-going practice, such as the presence of a seminary teacher or employee at registration in spring 1976 to assist students to register for seminary, or the offering of a prayer by the Junior Seminary Principal a few years ago, or the recognition of the Senior Seminary Principal on the stand and by introducing him at graduation exercises, or by allowing students to vote for student officers during a seminary class, or the appointment of a Junior Seminary teacher to serve on a public school safety committee. The fact that seminary teachers may eat in the public schools, as can any member of the general public, or that seminary personnel voluntarily help out at public school events is not an establishment of religion within the meaning of *Lemon*. The process of registration and recordation of attendance is accomplished with a minimum of procedural contact and bureaucracy. The maintenance of a box in the public schools where seminary teachers pick up pertinent notices and the mainte-

nance of an intercom and bell system in the seminary at seminary expense are matters of simple accommodation. The First Amendment is not offended by any of these activities. Their primary purpose and effect is to accommodate the wishes of the students and their parents in the most efficient manner possible. Any unconstitutional entanglements are minimal.

But, some administrative aspects of this release-time program exceed the constitutional parameters established by the Supreme Court. First, there is the attendance-gathering procedure used in regard to the seminaries—an admittedly minor matter. The burden of taking attendance in release-time classes is placed on the public schools, for student aides must go to the seminary buildings to pick up the attendance slips which have been prepared and provided by the public schools. This occurs for all classes including those which are admittedly denominational. Thus, school personnel and perhaps even a trifling amount of public funds aid the seminary in a responsibility that should be shouldered solely by the release-time program. The seminary program should accept the exclusive burden of taking attendance in its classes and supplying the public schools with the names of those students who were absent.

Next, the public schools' policy of permitting students to satisfy their minimum hour attendance requirements by enrolling in any one of the release-time classes must be held to be constitutionally invalid. A high school student's participation in school activities, honor roll and student elections is premised upon fulltime attendance in a public school. All ninth grade students must be accounted for during the entire school day and unless released must be enrolled in seven class periods per day. All high school students must be enrolled in a minimum of four classes per day. Although students may not receive an actual grade, they nevertheless may obtain at least a type of non-academic credit by attending release-time classes at least to the extent that they have been counted present in such classes. Quite possibly the only effect of this policy is the sponsorship and advancement of religion by rendering it advantageous for a student to take denominational classes.

Finally, to the extent to which the public school's receipt of state funds has been based on the counting of students for attendance in the public schools who have been released for any one of the seminary courses, such practice is impermissible. Probably very little government aid has been appropriated for the public schools as a consequence of including seminary class members in the average daily attendance report, but it is still theoretically possible that some State money has been awarded to the Logan City secondary schools because of this policy. This blending and integration of the public schools and seminaries for the purpose of receiving State aid results in a substantive and probably an administrative entanglement between church and state.

For the foregoing reasons it is the conclusion of this Court that the Logan City, Utah release-time program does not constitute a *per se* violation of the free exercise and establishment clauses of the First Amendment, and that none of the administrative or church-seminary integrational features of the program are constitutionally objectionable, except for the Defendants' policies and practices of granting credit for completion of the Old Testament and New Testament courses, the collecting of attendance reports, the fulfillment of minimum hour attendance requirements by enrollment in seminary classes, and the inclusion of release-time attendance for the purpose of receiving state funds.

An entire release-time program need not be invalidated merely because it contains several unconstitutional features. *Perry v. School District No. 81, Spokane*, 54 Wash.2d 886, 344 P.2d 1036 (1959). Judgment shall be entered declaring unconstitutional and enjoining only those impermissible policies and practices of the Defendants, and this opinion shall constitute the Findings of Fact and Conclusions of Law of this Court.

However, that judgment shall be prospective only in its effect. Admittedly, if it is not constitutionally permissible to grant academic credit for those courses today, it was not permissible to do so last year or the year before that, for our Constitution and First and Fourteenth Amendments have not been changed. However, in *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), a civil rights action, the Supreme Court held that new procedural rules affecting inquiries into infractions of prison discipline would not be retroactive. The Court, in reaching this decision, accorded great weight to the impact on prison administration and the good faith reliance on prior law by prison officials. Also, in *State of New York v. Cathedral Academy*, supra, that Court said that " 'in Constitutional adjudication as elsewhere, equitable remedies are a special blend of what is necessary, what is fair and what is workable.' "

Here it would be grossly unfair and inequitable to invalidate up to two hours of already earned academic credits and possibly prevent timely graduation from high school, by making our decision retroactive. Denial of academic credit must not deny students the right to graduate with their classmates. To allow it to do so would punish those students who have participated in the release-time program in the good faith expectation of receiving academic credit. It is also apparent that the Defendants justifiably relied on the State Board's policy. A retrospective application of this order would undoubtedly create significant administrative problems. See also: *Draper v. Travelers Insurance Company*, 429 F.2d 44 (10th Cir. 1970); *Americans United for Separation of Church & State v. Bubb*, 379 F.Supp. 872 (D.C.Kan.1974). The judgment therefore will also provide that students at Logan City High School who may now be enrolled in either the "Old Testament" or "New Testament" seminary classes for the present school year 1978–1979, shall not be required to complete any more than 15 academic credit hours in order to graduate, and that any of such students who have in past academic years completed such courses for credit shall not be denied such credit toward compliance with graduation requirements. It must further provide that no student's eligibility for participation during the current academic year in extracurricular activities may be withdrawn on account of his current enrollment in a release-time course of study.

It further goes without saying that the Defendants in the future must be absolutely neutral in their relationships with the LDS seminaries, their personnel and their programs.