634 F.2d 477
 Joseph ESPINOSA, Charles Shobe, Morton L. Dunkin, and
General Conference Corporation of Seventh-Day
Adventists, Plaintiffs-Appellees,
v.
David RUSK, Mayor; Patrick Baca, Joe R. Abeyta, Mel Aragon,
Thomas W. Hoover, Sandra L. West, Alan B. Reed, Jo McAleese,
Jim Delleney, Marion M. Cottrell, members of the City
Council of the City of Albuquerque, New Mexico; and Bob V.
Stover, Chief of Police of the City of Albuquerque, New
Mexico, Defendants-Appellants.
 No. 79-1477.
 United States Court of Appeals,
Tenth Circuit.
 Argued July 9, 1980.
Decided Oct. 21, 1980.
 
 George R. "Pat" Bryan, III, City Atty., Albuquerque, N. M. (Susan Green, Asst. City Atty., Albuquerque, N. M., on briefs), for defendants-appellants.
 Lee Boothby of Johns, Carson & Boothby, Washington, D. C. (Warren L. Johns, Walter E. Carson, Robert W. Nixon of Johns, Carson & Boothby, Washington, D. C., with him on briefs), for plaintiffs-appellees.
 Before BARRETT, DOYLE and McKAY, Circuit Judges.
 WILLIAM E. DOYLE, Circuit Judge.
 
 
 1
 The issue before us is whether an ordinance of the City of Albuquerque, New Mexico, as applied to the plaintiffs, violates the first and fourteenth amendments of the Constitution of the United States. The ordinance involves licensing and regulation of solicitation carried on by charitable organizations including some religious groups. The ordinance is numbered 72-1955.
 
 
 2
 The Seventh Day Adventist Church challenges the application of the ordinance to its annual solicitation drive in Albuquerque. The drive is known as the Ingathering. The money received in the drive is used for the support of various activities of the Adventist Church. These activities include medical, community, evangelical and educational services.[1] The Church maintains that all of these activities are part of its religious mission and thus are not subject to the ordinance's regulation; that such is prohibited by the Free Exercise of Religion Clause of the first amendment to the Constitution.[2] The mentioned clause of the Constitution is as follows:
 
 
 3
 "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."
 
 
 4
 The church maintains that all of its activities serve to spread the religious message of the Church.
 
 
 5
 The ordinance purports to exempt "religious" activities but does not exempt secular activities.
 
 
 6
 The controversy commenced when the Church contacted the City for the purpose of ascertaining whether the ordinance applied to the activities of the Church-the Ingathering. The Church provided the City with certain information required by the ordinance but refused to submit an application for a permit. When the City informed the Church that many of the activities which were being carried on were "secular" and that it was required to conform to the permit requirement, the present action challenging the constitutionality of the ordinance was filed.
 
 
 7
 The suit sought injunctive relief against the enforcement of the ordinance. Based on a stipulation of the parties, the district court entered a preliminary injunction which allowed the Church to continue with its activities during the pendency of the action. Later the cause was submitted to the court on a stipulation of the facts. Oral arguments were had and a judgment in favor of the Church was entered. The City was permanently enjoined from enforcing its ordinance insofar as the Ingathering program was concerned.
 
 
 8
 The ordinance undertakes to define the areas in which churches are exempt. These include solicitations by religious groups solely for "evangelical, missionary or religious but not secular purposes." The ordinance also defines the term secular as "not spiritual or ecclesiastical, but rather relating to affairs of the present world, such as providing food, clothing, and counseling." The City's determination was that the ordinance applied to the Church since it was soliciting funds for "secular" rather than for purely "religious or evangelical" purposes.
 
 
 9
 Compliance with the ordinance requires the payment of a $25.00 fee plus the filing of an application for a permit which calls for information as to the identity and address of the organization and its national and local officers, its purpose, the method of solicitation and the purposes for which funds are solicited. Also required is the time period during which solicitation will be pursued. In addition there must be furnished a financial statement.[3]
 
 
 10
 The district court determined that the ordinance as applied to the Church was invalid in that it employed a religious test in the exemption in Sec. 3(a) of the ordinance for "evangelical missionary or religious but not secular purposes." A decision as to whether a cause was religious or secular was deemed to be a religious test.
 
 
 11
 Such a determination is contrary to the first and fourteenth amendments. The decision of the Supreme Court in Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1943) was deemed by the trial court to be controlling. In Cantwell the Supreme Court held that the application of a statute which prohibited solicitations not found to be for religious causes was invalid. The statute in Cantwell prohibited solicitations:
 
 
 12
 for any alleged religious ... cause, from other than a member of the organization for whose benefit such person is soliciting ... unless such cause shall have been approved by the secretary of the public welfare council. Upon application ... in behalf of such cause, the secretary shall determine whether such cause is a religious one ... and, if he shall so find, shall approve the same and issue ... a certificate....
 
 
 13
 310 U.S. at 301, 60 S.Ct. at 902.
 
 
 14
 As we have previously noted the first amendment declares that Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof. This provision is applicable to the states through the fourteenth amendment. Murdock v. Pennsylvania, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943).
 
 
 15
 Cantwell is applicable to the present facts because the officials there were called upon, as in the present case, to ascertain and determine whether the proposed solicitations were for religious purposes. If the application failed the test there was no certification and no solicitations could legally take place. The Supreme Court held that the statute constituted a prior restraint on the free exercise of religion. It was said:
 
 
 16
 The general regulation, in the public interest, of solicitation which does not involve any religious test and does not unreasonably obstruct or delay the collection of funds, is not open to any constitutional objection, even though the collection be for a religious purpose. Such regulation would not constitute a prohibited previous restraint on the free exercise of religion or interpose an inadmissible obstacle to its exercise.
 
 
 17
 It will be noted, however, that the Act requires an application to the Secretary of the Public Welfare Council of the State; that he is empowered to determine whether the cause is a religious one, and that the issue of a certificate depends upon his affirmative action. If he finds that the cause is not that of religion, to solicit for it becomes a crime. He is not to issue a certificate as a matter of course. His decision to issue or refuse it involves appraisal of facts, the exercise of judgment, and the formation of an opinion. He is authorized to withhold his approval if he determines that the cause is not a religious one. Such a censorship of religion as the means of determining its right to survive is a denial of liberty protected by the first amendment and included in the liberty which is within the protection of the fourteenth.
 
 
 18
 310 U.S. at 305, 60 S.Ct. at 904.
 
 
 19
 Albuquerque seeks to distinguish Cantwell on the ground that the consequences of the religious/secular distinction in its ordinance does not result in a prohibition of the right to solicit but rather results only in regulation in the interest of preventing fraud. It is argued that if the solicitation is determined to be secular rather than religious it is merely necessary to apply for a permit (and be subject to the scrutiny of an official). No blanket prohibition is involved.
 
 
 20
 It is argued in addition that the present ordinance does not, as in Cantwell, allow an administrative official to make decisions as to whether a religious cause conformed to "reasonable standards of efficiency." It is said that this granted overbroad discretion, a condition which is not here present. The ordinance which we consider is said to not require a determination as to what is religious, for the purpose of censoring the activity, but merely for imposing reasonable regulations for preventing fraud and other similar conduct. But Cantwell found that an administrative determination as to what was religion or religious was objectionable.
 
 
 21
 The foregoing overlooks the fact that this is a very sensitive area. The setting up of a city agency to make distinctions as to that which is religious and that which is secular so as to subject the latter to regulation is necessarily a suspect effort. It may be that applied to an organization which can be shown to commit atrocities in the name of religion or with a religious cloak would present a different problem. We do not, however, have this condition here. The conception of religion entertained by the City in this very case was that it had to be purely spiritual or evangelical. Thus, the charitable activity of the church having to do with the feeding of the hungry or the offer of clothing and shelter to the poor was deemed to be subject to regulation. This broad definition of secular is part of the problem. Whether a less vigorous construction would result in a different conclusion is not, of course, before us and is not a proper subject for us to consider. Inasmuch, however, that the challenge is to the ordinance as applied we must conclude that the present effort is an invalid interference.
 
 
 22
 The drafters of the ordinance sought to accommodate free exercise by exempting evangelical, missionary or religious but not secular causes. Such an effort is a difficult one because of the continuing necessity for making judgments as to what is or is not religious. Thus, although the ordinance does not express any anti-religious effort or object, it is objectionable because it involves municipal officials in the definition of what is religious.
 
 
 23
 For this court to condemn all regulation of religious solicitation in broad terms would be out of harmony with the decided cases. The City retains its secular mission which is to protect its citizenry from fraudulent or overreaching solicitations. The opinion of the Supreme Court in Hynes v. Mayor of Oradell, 425 U.S. 610, 619, 96 S.Ct. 1755, 1760, 48 L.Ed.2d 243 (1976) recognizes this. Its teaching is to be gleaned from the following statement:
 
 
 24
 "A narrowly drawn ordinance, that does not vest in municipal officials the undefined power to determine what message residents will hear, may serve these important interests without running afoul of the First Amendment."
 
 
 25
 See also Schaumburg v. Citizens for a Better Environment, 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980); Breard v. Alexandria, 341 U.S. 622, 71 S.Ct. 920, 95 L.Ed. 1233 (1951); Thomas v. Collins, 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430 (1945); Martin v. Struthers, 319 U.S. 141, 63 S.Ct. 862, 87 L.Ed. 1313 (1943).
 
 
 26
 It is well to review this further admonition contained in the Cantwell opinion. The Court said:
 
 
 27
 Nothing we have said is intended even remotely to imply that, under the cloak of religion, persons may, with impunity, commit frauds upon the public. Certainly penal laws are available to punish such conduct. Even the exercise of religion may be at some slight inconvenience in order that the state may protect its citizens from fraudulent solicitation by requiring a stranger in the community, before permitting him publicly to solicit funds for any purpose, to establish his identity and his authority to act for the cause which he purports to represent.
 
 
 28
 310 U.S. at 306, 60 S.Ct. at 904.
 
 
 29
 Regulations, however, which restrict the exercise of first amendment rights by requiring prior approval are going to be suspect, and will face an unfavorable presumption in regard to constitutional validity. Bantam Books v. Sullivan, 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963). Any standard set forth must be "susceptible of objective measurement," Keyishian v. Board of Regents, 385 U.S. 589, 603-604, 87 S.Ct. 675, 683-684, 17 L.Ed.2d 629 (1967), and "precision of regulation must be the touchstone." NAACP v. Button, 371 U.S. 415, 438, 83 S.Ct. 328, 340, 9 L.Ed.2d 405 (1963). Sufficient procedural safeguards must be present. See Freedman v. Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965). Regulation which burdens the free exercise of religion and poses a threat of entanglement between the affairs of Church and State must be justified by a compelling state interest, Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), and there must not exist less restrictive and entangling alternatives. Walz v. Tax Commission, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970). There are some recent decisions which have considered the validity of solicitation ordinances in light of these constitutional standards. See International Society for Krishna Consciousness v. Rochford, 585 F.2d 263 (7th Cir. 1978); Fernandes v. Limmer, 465 F.Supp. 493 (N.D.Tex.1979); Cherris v. Amundson, 460 F.Supp. 326 (E.D.La.1978); Swearson v. Meyers, 455 F.Supp. 88 (Kan.1978); International Society for Krishna Consciousness v. Griffin, 437 F.Supp. 666 (W.D.Pa.1977).
 
 
 30
 Judge Bratton's opinion in the district court reached the conclusion which we have come to and we do not disagree with any of the reasoning which was employed by him.
 
 
 31
 The judgment of the district court is affirmed.
 
 BARRETT, Circuit Judge, dissenting:
 
 32
 I respectfully dissent.
 
 
 33
 The conscientious District Court grappled with the difficult factual problem presented in this case in reaching the legal conclusion, affirmed by the majority opinion, which has firm rooting in constitutional law. The particular problem relates to the definition of "religious" and "secular" activities and the interrelationship one to another. This, in turn, is bound up in one of the most trying and vexing tasks found in constitutional law-that of defining "religion" for purposes of First Amendment rights.
 
 
 34
 In the consideration of whether the "secular" law constitutes an impermissible burden on the free exercise of "religion" the State must show a compelling reason to enforce its law. This is difficult because the crux of many decisions seems to not only recognize the right of the individual to define his own religion and to exercise his individual beliefs therein free of government restraint or compulsion, but he is further protected in acting upon those beliefs even in the face of non-discriminatory secular enactments. The burden was traditionally on the person contending that his religious activity would not interfere with a recognized state interest. That burden, however, has shifted. Today it is the obligation of the state to show that both the religious belief and practice will endanger a state interest and that the restraining action imposed cannot be supplanted by any reasonable alternative. United States v. Seeger, 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965); Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). No advantage can accrue to orthodox religious beliefs under the religious belief test announced in United States v. Seeger, supra. The breadth of the new test finds room for "religious" beliefs protected by the Free Exercise Clause relating to topics such as the use of drugs in religious exercise, refusal to work on Sabbaths, opposition to all war and blood transfusions.
 
 
 35
 In my view, the very breadth of the "religious" definition so recognized requires a common sense approach to the so-called "secular" entanglement therein. It is illogical, in my view, to simply prohibit the enforcement of a state law designed to protect the citizens from fraudulent solicitations in all cases where the "religious" cult, sect or organization proclaims that practices which have been historically secular in these United States, i. e., government aid to the poor, to the sick and the homeless, are, for statutory exemption purposes, "religious" activities because of the announced beliefs.
 
 
 36
 I believe that the accommodation between church and state so often recognized in the realm of the prohibition against the establishment of religion proclaimed in the First Amendment-the Establishment Clause-can and should be logically applied in cases such as that presented here involving the Free Exercise Clause. The Supreme Court has consistently recognized that a certain amount of church-state entanglement will exist. Abington School Dist. v. Schempp, 374 U.S. 203, 212, 83 S.Ct. 1560, 1565, 10 L.Ed.2d 844 (1963); Engel v. Vitale, 370 U.S. 421, 434, 82 S.Ct. 1261, 1268, 8 L.Ed.2d 601 (1962). In the context of those decisions, the critical issue was not whether there exists some entanglement but rather whether the entanglement is excessive and thus violative of the Establishment Clause.
 
 
 37
 Just as the Supreme Court has recognized that the line of separation of church and state required under the Establishment Clause is neither straight nor easily determined, Committee for Public Education & Religious Liberty v. Regan, 444 U.S. 646, 100 S.Ct. 840, 63 L.Ed.2d 94 (1980), and that the First Amendment does not forbid all mention of religion in public schools, but rather that religion be neither advanced or inhibited, Committee for Public Education v. Nyquist, 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973), I would impose similar criteria to the case at bar and pose this inquiry: Does the Albuquerque ordinance challenged here impose an undue, excessive restraint upon the Seventh Day Adventist Church's religious activity (its annual solicitation drive in Albuquerque) by requiring a prior application for permit to solicit for funds intended for "secular activities"? I would answer the inquiry in the negative. In my view, then, the ordinance passes constitutional muster. I believe this to be so because the City's determination that the solicitation of funds for medical, food, clothing and shelter are secular is common-sensed and rational. It does not impose an impermissible religious test violative of the mandate of Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). That case involved solicitations of funds going directly to the heart of religion. A distinction must be drawn, however, between those activities characteristic of secular life, historically of primary and compelling concern of the community and government, which are also pursued by religious organizations. Thus, I would sustain the Albuquerque ordinance, insofar as it pertains to those activities overwhelmingly secular in nature, in keeping with the City's compelling interest in preventing fraud. The burden cast upon a religious organization in meeting the requirements of the licensing ordinance is de minimus in relation to the City's compelling interest in preventing fraudulent solicitations of its residents.
 
 
 
 [1]
 Some of the monies raised are used for the purchase of food, clothing and shelter for those in need
 
 
 [2]
 The due process and equal protection clauses of the fourteenth amendment restrict the state and city legislative bodies from encroaching on the free exercise of religion
 
 
 [3]
 Section 8. Application for a Permit-Filing-Content-Requirements. An application for a permit for a charitable organization shall be filed as prescribed by rules and regulations which the Board may adopt and shall contain the following documents and information:
 A. The name of the charitable organization and the name under which it intends to solicit contributions.
 B. The names and addresses of its national and local directors, trustees, and officers and local key persons.
 C. The location of the organization's financial records.
 D. Methods by which solicitation will be made, including a statement as to whether such solicitation is to be conducted by voluntary unpaid solicitors, by paid solicitors, or both, and a narrative description of the promotional plan together with copies of all advertising material which has been prepared for public distribution by any means of communication and any location of any telephone solicitation facilities; solicitation by means of coin boxes or receptacles must be expressly authorized by the Board.
 E. The names and address of any professional fund raisers who are acting or who have agreed to act on behalf of the charitable organization together with a statement setting forth the terms of the arrangements for compensation to be paid the professional fund raisers.
 F. The general purpose for which the charitable organization is organized.
 G. Where and when the organization was legally established, the form of its organization, and its federal tax exempt status.
 H. The purposes for which the contributions to be solicited will be used, the total amount of funds proposed to be raised thereby, and the use or disposition to be made of any receipts therefrom.
 I. The period of time during which the solicitation will be made.
 J. A financial statement of any funds collected for charitable purposes by the applicant for the preceding fiscal year. Such statement shall set forth the amount of money raised and the cost of solicitations and final distribution of the balance by major category. The financial statement shall be submitted on a uniform reporting form provided by the Board.
 K. Whether the organization is authorized by any other governmental authority to solicit contributions and whether it is or has ever been enjoined by any court from soliciting contributions.
 L. Such other information as may be reasonably required by the Board shall be in the public interest provided that disclosure of names of donors or amounts of contributions shall not be required.
 If there is any change, while any application is pending in fact, policy, or method that would alter the information given in the application, the applicant shall notify the Board in writing thereof within five days, excluding Saturdays, Sundays and legal holidays after such change.