662 F.2d 1349
 1 Ed. Law Rep. 138
 Ronald M. LANNER, Harriet F. Lanner, John A. Scherting, on
behalf of themselves and all others similarly
situated, Plaintiffs-Appellants,
v.
Joanne WIMMER, Thad Carlson, E. Malcolm Allred, Ronald A.
Peterson, Maria Ellworth, constituting the Board of
Education for the City of Logan, Utah; James C. Blair,
Superintendent of Schools for the City of Logan, Utah; Rulon
C. Olsen, Principal, Logan High School, Logan, Utah; Sherman
Hansen, Principal, Logan Junior High School, Logan, Utah;
and their officers, employees, agents and assigns; and the
Utah State Board of Education, Defendants-Appellees, and
Cross-Appellants.
 Nos. 79-1520, 79-1525.
 United States Court of Appeals,
Tenth Circuit.
 Argued and Submitted July 9, 1981.
Decided Oct. 13, 1981.
On Rehearing Nov. 25, 1981.
 
 Kathryn Collard, Salt Lake City, Utah, for plaintiffs-appellants.
 Arthur H. Nielsen, Salt Lake City, Utah (with Clark R. Nielsen, Salt Lake City, Utah, on the brief), of Nielsen, Henriod, Gottfredson & Peck, Salt Lake City, Utah (and with David W. Sorenson, Logan, Utah, on the brief); and Thomas C. Anderson, Asst. Atty. Gen., Salt Lake City, Utah (with Robert B. Hansen, Atty. Gen., Salt Lake City, Utah, on the brief), for defendants-appellees and cross-appellants.
 Before BARRETT, DOYLE and McKAY, Circuit Judges.
 McKAY, Circuit Judge.
 
 
 1
 This case is a challenge to a school "released-time" program which permits students to take church-sponsored seminary classes off school premises during school hours. The challenge is based on the establishment and free exercise clauses of the first amendment.
 
 I. Background
 
 2
 The proper adjudication of a case involving the interplay between religion and government-mandated public school programs is assisted by an outline of the problems inevitably created by the entry of government into the business of purveying ideas through public education. The general principles for resolving the inevitable conflicts must be gleaned from the cases so far decided by the Supreme Court.
 
 
 3
 The drafters of the first amendment probably foresaw little or no conflict between that amendment's protection of the free exercise of religion and its prohibition against congressional laws respecting an establishment of religion. The incorporation of both clauses into the fourteenth amendment[1] and the advent of the widespread entry of government into the business of teaching and compulsory education,[2] however, made conflict between the two clauses inevitable, and it seems doubtful that any court ruling or series of rulings will substantially reduce the claims of conflict. No comprehensive school curriculum worthy of public support can be developed without broaching subjects and questions concerning morality and the origin, meaning, and destiny of humanity. Teachings concerning these same topics have been central to the role of religion from time immemorial. No matter how public school teachers treat such subjects as history, literature, psychology, biology, anthropology, and geology, their concepts ostensibly approved and even imposed by state authority will inevitably offend the deeply held religious beliefs of some students and parents. Children are and will be compelled, on pain of reduced grades, to give answers which both directly and by implication lead to the conclusion that their religious beliefs are false. So long as the state engages in the widespread business of molding the belief structure of children, the often recited metaphor of a "wall of separation"[3] between church and state is unavoidably illusory.
 
 
 4
 The conflicts between public school curricula and religious doctrines cannot be avoided by simply declaring that everything public schools teach is "secular" and therefore not religious. Such a shallow definitional approach ignores the role that religion has historically played, and will likely continue to play, in the development of belief systems. At the same time, it is far too late in our history to remove government from the business of teaching ideas, through public education, about the nature and history of humanity. Notwithstanding the metaphor of a wall of separation, it is unavoidable that conflict will exist between the demands of the free exercise clause and those of the establishment clause at least in the competition for the minds of the nation's children. In the milieu of public education, there is not an impregnable wall of separation. Rather, the inevitable conflicts outlined above dictate that there must be some measure of accommodation to avoid the constitutionally impermissible result of totally subordinating either religion clause to the other. The principles for resolving the inevitable conflicts and the degree of permissible and necessary accommodation have been set forth by the Supreme Court. Our task in this case is to apply those principles.
 
 
 5
 The general test for determining whether a state statute violates the establishment clause was set forth in Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). The three prongs of the test are: (1) the statute must have a secular legislative purpose; (2) its principal or primary effect must be one that neither advances nor inhibits religion; and (3) the statute must not foster an excessive government entanglement with religion. Id. at 612-13, 91 S.Ct. at 2111. Other cases involving the constitutionality of state statutes and programs set forth specific principles applicable to the case before us.
 
 
 6
 DB1(2-4) The first principle made clear by the cases is that states may not use compulsory public education laws to prohibit parents from avoiding religiously offensive instruction by opting for totally private sectarian education for their children. Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925).[4] States are permitted to recognize attendance at church-sponsored schools as satisfying compulsory education laws as to the number of hours in attendance and as to specified subjects studied. Everson v. Board of Education, 330 U.S. 1, 18, 67 S.Ct. 504, 512, 91 L.Ed. 711 (1947); Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925). Some entanglement is permissible to insure educational minimums in private religious schools. A state may require that attendance at private schools, if it is to satisfy state compulsory-attendance laws, be at institutions which provide minimum hours of instruction under the supervision of teachers of specified training and covering certain prescribed subjects. Board of Education v. Allen, 392 U.S. 236, 245-46, 88 S.Ct. 1923, 1927, 20 L.Ed.2d 1060 (1968).
 
 
 7
 Some forms of state financial assistance to church-sponsored schools are also permitted,[5] while other forms are prohibited.[6]
 
 
 8
 The Constitution also permits public schools to accommodate students' religious beliefs so that students may claim their free exercise rights without being forced to withdraw totally from public schools. Public schools may permit the release of students during school hours for attendance at religious classes taught by religious teachers on private property but not on public school premises. Zorach v. Clauson, 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952); McCollum v. Board of Education, 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649 (1948).
 
 
 9
 Courts have rarely entered the thicket of trying to supervise the manner in which public schools teach traditional subjects which may conflict with or offend the religious sensibilities of some students.[7] It is clear, however, that public schools are prohibited from engaging in activities which are essentially religious, religiously ceremonial, or worship-like, such as the recitation of prayer or scripture, School District of Abington v. Schempp, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963); Engel v. Vitale, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962), and the posting of the ten commandments on classroom walls, Stone v. Graham, 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980). Also, while public schools may conduct patriotic ceremonies such as the pledge of allegiance, they may not compel participation by children who object on free exercise grounds. West Virginia State Board of Education v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943).
 
 II. Facts
 
 10
 With this general outline in mind, we turn to the facts of the case before us. The Logan School District has implemented a permissive released-time program for public school students in grades nine through twelve. The released-time program is available to any student who wishes to enroll in a course sponsored by any religious organization. There is evidence in the record that non-religious activities may also be approved in the released-time program. Except for some occasional enrollment in released-time classes sponsored by several Protestant churches in the community, however, the overwhelming use of the program is by persons attending released-time classes offered by a seminary operated by the Church of Jesus Christ of Latter-Day Saints (L.D.S. Church). The trial court carefully summarized the administration of the released-time program as follows:
 
 
 11
 Administration of the Release Time Program and Integration
 
 Between Schools
 
 12
 Registration at Logan Senior High School and Junior High School occurs in the spring preceding the school year in which the classes are to be taken. Although differing in many respects, registration for the release-time program is generally similar. Each student completes and returns to the high school or junior high a preregistration form or class schedule. If such student desires to attend seminary he or she indicates such a desire by requesting released time on the pre-registration form. The students or their parents are furnished forms by the seminary or ecclesiastical officers of the L.D.S. Church, on which parents may request permission from the school to have their children released for one period during the school-day throughout the school year to take a course at the L.D.S. seminary. Those forms are then returned to the seminary which in turn forwards them to the high school or the junior high. The slips are checked by the public schools to insure that there is a completed form for each student who has requested release-time for participation in the L.D.S. Seminary Program. The permission slips are kept on file for approximately 3 years. Schedules for classes, school catalogues and registration forms at Logan High School do not contain any schedules of release-time classes. However, the preregistration for students of Logan Junior High School lists "Release Time" as a course option. Registration for the release-time programs in the junior and senior high schools differs significantly in one respect. The Logan Junior High School officials do not permit the student to determine which hour of the day the student will be excused but make such determination themselves so as to maintain better control over the student program. The senior high students are responsible for designating the hour they wish to be released on their final submitted class schedule. Thus, registration for release-time classes regularly occurs off the public school premises, on forms supplied by the seminaries, and by personnel employed or engaged by that institution. Although at least one member of the LDS seminary staff or faculty was present at Logan High School during registration in 1976, this incident appears to be isolated and it is not now the practice of release-time personnel to be present and assist at the public schools' registration.
 
 
 13
 The high school and junior high school each make a daily attendance check of all students enrolled in each school. The attendance slips for each class are collected by a student who participates in an office practice class and who personally visits each classroom and obtains a list of those students who are absent from class. A similar check is made of those students attending LDS seminary by picking up a list, on a form furnished by the public school, of those students absent from seminary class. If students are repeatedly absent from regular school classes or seminary classes, their parents are contacted by public school personnel, in order to maintain overall discipline and be apprised of the whereabouts of its students; but parents are not contacted by public school officials merely to report absences from Seminary. Attendance is not reported on any permanent record but absences appear on the students' administrative records which are stored in school files for several years.
 
 
 14
 The high school records a student's grade in the Old and New Testament courses on his or her permanent records. Since credit is not given for any classes taken in the ninth grade no such procedure is followed in the junior high schools. Neither the seminary grade nor attendance record is recorded on a student's public school report card.
 
 
 15
 Each of the public school buildings is equipped with a public address system over which announcements are made to the students and a bell system which rings to denote the beginning and ending of each class period. The LDS seminaries have an attachment to the public address systems so that announcements in the junior high school or senior high school as well as the class bells can be heard in the Seminary buildings. However, no announcements can be made from the seminary into the school system nor is the seminary permitted to make any announcement over the school system. The cost of installation and maintenance of the public address system extensions has been paid by the seminaries.
 
 
 16
 Teachers in the LDS programs hold parent-teacher conferences in the seminary buildings on the same dates and times as such conferences are held by the teachers in the public schools. It appears that this is done as a matter of convenience and accommodation for the public and all concerned rather than by specific prearrangement between the school officials and Seminary personnel.
 
 
 17
 At both the junior and senior high schools the LDS seminary has access during school hours to a box in which notices are placed regarding school programs or changes in school schedules, which may affect the daily routine of the public schools. The seminary may then adjust its schedule to accommodate the school and student by permitting the public school to preempt the time for which a student is otherwise released. Any mail addressed to the seminary which is mistakenly delivered to the school is also placed in the box rather than being returned to the post office.
 
 
 18
 The seminary facultymen, as members of the general public, are requested from time to time to assist in public school activities such as taking tickets at school events, handling line markers at football games, and timing events in track meets. Release-time personnel are also allowed to eat in the junior or senior high school cafeterias, as are any of the citizens of Logan City, but seminary staff and faculty who utilize the cafeteria are required to pay for their meals at the standard rate for the public.
 
 
 19
 Senior students at the high school are permitted to list their extracurricular or other activities in the annual yearbook, including their participating in seminary. This reference to seminary is neither sanctioned nor encouraged by the school, but is left to the discretion of the students. Many of the other activities listed in the yearbook by the students are unrelated to school functions.
 
 
 20
 The Logan City School Board's rules require that students in the junior high school be accounted for during regular school hours each day and be enrolled in seven (7) class periods per day unless released at the request of the parents to attend L.D.S. Seminary. Students in the senior high school are eligible to participate in interschool activities, honor roll and student body elections only if they are attending six (6) class periods per day. Enrollment in any of the four release-time courses is accepted by the school as a class period in partial fulfillment of that requirement.
 
 
 21
 The junior and senior high schools receive from the State public funds for their operation and maintenance, based upon the number of students in attendance each day. In order to be counted for the purpose of receipt of state funds by a school, a student must attend four (4) class periods of the day. Attendance in any of the release-time courses by a student is not necessarily counted as "attending" for the purpose of determining entitlement to state funds, but the method used in the past for counting attendance resulted in counting such release-time attendance.
 
 
 22
 Other contacts between the public school and the seminary which have occurred in recent years include: the offering of a prayer by a seminary official at a school function; voting and collecting votes by the student body for public school elections during seminary class; references to seminary activities in the student paper; the appointment of a seminary faculty member to serve on a public school committee; and the use of seminary classes as homerooms for the public school. These activities, however, were either isolated events or were discontinued prior to the initiation of this suit.
 
 
 23
 Lanner v. Wimmer, 463 F.Supp. 867, 872-74 (D.Utah 1978).
 
 
 24
 Plaintiffs represent the class of parents of present and future students of Logan High School and Logan Junior High School. They challenge the released-time program under both the establishment clause and the free exercise clause and seek declaratory and injunctive relief. The trial court held that a released-time program per se does not violate the first amendment, but held that certain aspects of this program violate the establishment clause. The trial court enjoined the granting of credit for completion of the Old Testament and New Testament courses offered by the L.D.S. seminary, the collecting of seminary attendance reports by the schools, the recognition of enrollment in seminary classes in fulfillment of minimum hour attendance requirements, and the counting of seminary attendance in the formula for the school district's eligibility for state funds. 463 F.Supp. at 876-83.
 
 
 25
 The trial court refused to award attorney's fees to either party. Plaintiffs appeal, arguing that the trial court's decision did not go far enough and objecting to the denial of their claim for attorney's fees. Defendants cross-appeal, challenging the certification of the class, objecting to the trial court's finding of constitutional violations, and objecting to the denial of their claim for attorney's fees.
 
 III. Class Action
 
 26
 Defendants object to the trial court's certification of this action as a class action. We believe that the district court did not abuse its discretion in finding that plaintiffs' proposed class met the requirements of Fed.R.Civ.P. 23(a) and (b)(2).[8] The fact that the class may have included persons who support the released-time program does not offend the principles set down in Hansberry v. Lee, 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940). It is not "fatal if some members of the class might prefer not to have violations of their rights remedied." United States Fidelity & Guaranty Co. v. Lord, 585 F.2d 860, 873 (8th Cir. 1978) (quoting Leisner v. New York Telephone Co., 358 F.Supp. 359, 372 (S.D.N.Y.1973)), cert. denied, 440 U.S. 913, 99 S.Ct. 1228, 59 L.Ed.2d 462 (1979).
 
 
 27
 IV. The Constitutionality of the Released-Time Program
 
 
 28
 Notwithstanding continuing scholarly debate,[9] it is clear that released-time programs permitting attendance at religious classes off school premises do not per se offend the establishment and free exercise clauses. Zorach v. Clauson, 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952). Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), and its progeny, which established the three-pronged test of constitutionality, do not impair this conclusion. While the three-pronged test was not extant when Zorach was decided, cases applying the test cite the continuing vitality of Zorach and treat released-time programs as satisfying the test.[10] Meek v. Pittenger, 421 U.S. 349, 359, 95 S.Ct. 1753, 1760, 44 L.Ed.2d 217 (1975); Lemon v. Kurtzman, 403 U.S. 602, 614, 91 S.Ct. 2105, 2112, 29 L.Ed.2d 745 (1971).
 
 
 29
 The School Board's desire to accommodate the public in its spiritual needs satisfies the secular legislative purpose prong of the test. Zorach v. Clauson, 343 U.S. at 314, 72 S.Ct. at 684; see Smith v. Smith, 523 F.2d 121, 124 (4th Cir. 1975), cert. denied, 423 U.S. 1073, 96 S.Ct. 856, 47 L.Ed.2d 83 (1976). Likewise, it is clear that the mere release of students during school hours to attend religious courses does not unconstitutionally advance or inhibit religion, even though as a practical matter any accommodation is beneficial to religious interests just as failure to make some accommodation can be injurious to religious interests. As the court observed in Smith:
 
 
 30
 In Meek (v. Pittenger, 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975),) the Court expressly cited Zorach as viable authority. 421 U.S. at 359, 95 S.Ct. 1753 (at 1760). Although Zorach was decided many years before the Court fashioned the tripartite test, the Meek citation indicates that Zorach is not inconsistent with the tripartite test. Indeed, Zorach illuminates the test. Therefore, it is our duty to follow Zorach and to understand the modern test in the light of Zorach's continuing viability. McCray v. Burrell, 516 F.2d 357, at 365 (4th Cir. 1975), cert. filed (1975).
 
 
 31
 The necessary effect of the release-time program in Zorach must have been much the same as the effect which the district court discerned in the instant case. Since Zorach is still good law, it must be that this effect is indirect or incidental rather than principal or primary. As the Court has recently reasserted, with a citation to Zorach, "not all ... programs that provide indirect or incidental benefit to a religious institution are prohibited by the Constitution." Meek v. Pittenger, 421 U.S. 349, at 359, 95 S.Ct. 1753, 1760, 44 L.Ed.2d 217 (1975).
 
 
 32
 We take this language to mean that the primary effect of the public school's release-time program in Zorach must be seen as simply the innocuous diminishing of the number of children in school at a certain time of day.
 
 
 33
 Smith v. Smith, 523 F.2d 121, 124-25 (4th Cir. 1975), cert. denied, 423 U.S. 1073, 96 S.Ct. 856, 47 L.Ed.2d 83 (1976). Zorach 's continuing vitality also indicates that a released-time program per se does not create an excessive government entanglement with religion.
 
 
 34
 Even though public school accommodation of religious beliefs through a released-time program is a largely passive response to parental assertions of the right to "direct the upbringing and education of children," Pierce v. Society of Sisters, 268 U.S. 510, 534-35, 45 S.Ct. 571, 573, 69 L.Ed. 1070 (1925); see also Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), the particular manner of implementation of the program nonetheless violates the establishment clause if it offends one of the three prongs of the test.
 
 
 35
 The trial court enjoined the attendance-gathering procedure, under which student aides must go to the seminary buildings to pick up attendance slips which have been prepared and provided by the public schools. In the released-time program approved in Zorach, the churches involved made weekly attendance reports to the schools. 343 U.S. at 308, 72 S.Ct. at 681. In this case, the schools bear more of the administrative responsibility for preparing and gathering attendance reports.
 
 
 36
 We agree with the trial court that this is "an admittedly minor matter." 463 F.Supp. at 883. However, any released-time program, by its very nature, presents the potential for unconstitutional entanglement of public schools with religious institutions. For this reason, the least entangling administrative alternatives must be elected when a released-time program is instituted.
 
 
 37
 As discussed infra, public schools have a legitimate interest in knowing where their students are during school hours. Here, the attendance slips which have been prepared by the public schools and supplied to the seminary are the least entangling alternative for the public schools to assure themselves of a student's presence in a released-time course. Providing the released-time administrators with uniform attendance slips is the most efficient way of integrating the released-time course's attendance reporting into the attendance data received from public school classes.
 
 
 38
 The public school's assumption of the burden of gathering these attendance reports, however, overlooks less entangling alternatives. It is less entangling but as solicitous of the state's interests to require released-time personnel to transmit attendance reports to the public school. Because the alternative chosen by the public schools here is not the least entangling, it must fall.
 
 
 39
 Putting aside for a moment the question of credit, which we will discuss later, we agree with the trial court that the other challenged aspects of the released-time program do not violate the establishment clause. The registration and recordkeeping involved are necessary to administer the released-time program and do not excessively entangle the government in religion or indicate the schools' endorsement of the content of released-time courses. The integration of the released-time program into the public school schedule is nothing more than an administrative effort to accommodate the released-time program with as little inconvenience to students as possible. Aside from the question of credit, the released-time program here emerges after the trial court's order as substantially similar to the program upheld in Zorach. We hold that except for credit and the attendance-gathering procedure, neither the individual aspects of the released-time program nor the cumulative effect of the various aspects of the program violate the establishment clause.
 
 
 40
 Plaintiffs maintain, however, that defendants' program is more constitutionally pernicious than that in Zorach. They point out that the L.D.S. Church's seminary buildings are architecturally similar to the public school buildings they are adjacent to. We do not perceive a problem of constitutional magnitude in the way a church chooses to build its chapels or other buildings on its property. Indeed, a serious constitutional issue would arise were we to presume to tell a church how or where it may fashion its places of worship.
 
 
 41
 Plaintiffs also note that participating students in Logan's junior and senior high schools are released one hour per day to receive L.D.S. instruction, whereas in Zorach students were released approximately one hour per week. The Zorach Court did not find the amount of time a student is allowed to spend under religious tutelage to be dispositive of or even relevant to its decision. Although accommodation may slip into abdication at some point, defendants have not reached that point here.
 
 
 42
 Plaintiffs object to the intercom system through which public school announcements and bells can be heard in seminary classes and also object to boxes in the public school buildings where seminary personnel can obtain school notices and information. These aspects of the released-time program satisfy the three-pronged test and are therefore permissible. First, they have the secular purpose of apprising students and seminary personnel of school activities, some of which will require scheduling changes in the released-time program so the program does not interfere with the school activities. The bells help insure that students attending released-time classes will return to their school classes at the proper time and that the released-time program will not disrupt the public school schedule.
 
 
 43
 The primary effect of these aspects of the program is simply to make the school's administration of the released-time system convenient and to avoid unnecessary conflicts with school classes and activities. The seminaries pay for the installation and maintenance of the intercom system, and the cost of the boxes is presumably negligible. These aspects of the program neither advance nor inhibit religion.
 
 
 44
 Neither do these aspects of the program foster an excessive government entanglement with religion. The intercom system does not allow the seminary to make announcements to the schools. It merely allows the school to inform students attending released-time classes of school announcements, activities, and scheduling. The boxes provide seminary personnel with the same information so the seminary can adjust its schedule and permit the school to preempt the time for which a student is otherwise released. Neither the intercom system nor the boxes create such symbolic identification between the schools and the seminaries as to render these aspects of the program unconstitutional.
 
 
 45
 The district court was also correct in holding that plaintiffs' rights under the free exercise clause are not denied by operation of the released-time program. Plaintiffs complain of social pressures but do not allege that this peer pressure is participated in or sanctioned by defendants.
 
 V. Credit
 
 46
 As in this case, numerous aspects of state and school requirements are defined in terms of hours and "credit." State laws mandate attendance at educational institutions. School boards typically require an overall number of daily, term, and annual hours of enrollment to satisfy attendance requirements and usually require a minimum number of hours in given subjects of instruction. The complex world of school financing, involving grants to local public schools from federal and state sources, is likewise often based on daily attendance. These units of measurement are frequently referred to as "credit." "Credit," as the term is used in this case, has multiple definitions. A proper adjudication of the constitutionality of defendants' activities requires an understanding of the various uses for which the term is employed.
 
 
 47
 First, "credit" is used to measure the number of hours or units of instruction required for graduation from Logan Senior High School. During the three years of high school, students are required to complete courses having a total value of sixteen "contact units of approved work" in order to graduate. Eight and one-half of these units must be in certain specified subjects. No released-time courses may count toward the satisfaction of these eight and one-half units. The balance of seven and one-half units required for graduation may be satisfied by "elective" courses. Two released-time units in Bible history courses may be counted as "elective" hours.
 
 
 48
 The Utah Board of Education's most recent policy statement, adopted in 1969, provides:
 
 
 49
 Credits for work taken in released-time classes should be recognized by public schools only upon an official transcript of credits from the institution conducting such classes, and upon evaluation on the same basis that similar credits from established private high schools are evaluated. (The State board has authorized high schools to recognize not to exceed two units of Bible history for work taken in private seminaries or schools. Such credit may be counted as an "elective" but may not fill any requirements for required instruction in the fields of social studies, English or literature. No credit is to be given to courses devoted mainly to denominational instruction.)
 
 
 50
 Record, vol. 2, at 350-g.
 
 
 51
 The district court was concerned that "(t)he public school policy of granting credit for those courses which are not 'mainly denominational' presupposes that there must be monitoring by the public school authorities to insure that the classes do not become sectarian in nature." 463 F.Supp. at 881. Since the State Board of Education's released-time policy statement apparently requires such monitoring, it implicates an unconstitutional entanglement between school authorities and religious institutions.[11] See Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). Also, a purely religious test for determining what is not "mainly denominational," and therefore credit-worthy, is not to be left to the state. See generally Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1943); Espinosa v. Rusk, 634 F.2d 477 (10th Cir. 1980). The constitutional problem with the administration of "elective credit" when such credit is granted to some released-time courses but not to others based upon a religious test is that it requires the public school officials to entangle themselves excessively in church-sponsored institutions by examining and monitoring the content of courses offered there to insure that they are not "mainly denominational."[12]
 
 
 52
 The state can, however, require that released-time courses for which credit is granted fulfill certain secular criteria. A state's requirement that church-sponsored schools meet certain secular standards if attendance at them is to satisfy state compulsory education laws does not unconstitutionally involve the state in religious institutions, even though it does implicate some entanglement. The state can constitutionally "insist that attendance at private schools, if it is to satisfy state compulsory-attendance laws, be at institutions which provide minimum hours of instruction, employ teachers of specified training and cover prescribed subjects of instruction." Board of Education v. Allen, 392 U.S. 236, 245-46, 88 S.Ct. 1923, 1927-28, 20 L.Ed.2d 1060 (1968). See also Committee for Public Education and Religious Liberty v. Regan, 444 U.S. 646, 653-54, 100 S.Ct. 840, 846-47, 63 L.Ed.2d 94 (1980); Wolman v. Walter, 433 U.S. 229, 240, 97 S.Ct. 2593, 2601, 53 L.Ed.2d 714 (1977). This de minimis entanglement could also be used to determine what courses are properly transferable for "credit" when a private religious school student transfers to a public school. In like manner, a school with a released-time program could require that released-time courses meet certain secular standards before credit is awarded for their completion. School authorities may inquire into the training of teachers and whether a particular course covered a subject for which "credit" could be granted. Such inquiry is analogous to the state's constitutional perusal of full-time private schools. These inquiries, however, could not be designed simply to ferret out religious courses.
 
 
 53
 If the school officials desire to recognize released-time classes generally as satisfying some elective hours, they are at liberty to do so if their policy is neutrally stated and administered. Recognizing attendance at church-sponsored released-time courses as satisfying graduation requirements advances religion no more than recognizing attendance at released-time courses or full-time church-sponsored schools as satisfying state compulsory attendance laws. If the extent of state supervision is only to insure, just as is permitted in the case of church-sponsored full-time private schools, that certain courses are taught for the requisite hours and that teachers meet minimum qualification standards, nothing in either the establishment or free exercise clauses would prohibit recognizing all released-time classes or none, whether religious in content or not, in satisfaction of graduation requirements. It is when, as here, the program is structured in such a way as to require state officials to monitor and judge what is religious and what is not religious in a private religious institution that the entanglement exceeds permissible accommodation and begins to offend the establishment clause. See Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1972); see generally Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1943); Espinosa v. Rusk, 634 F.2d 477 (10th Cir. 1980).
 
 
 54
 The trial court therefore properly enjoined the practice of granting "credit" in satisfaction of "elective" courses insofar as the program required a judgment as to whether the courses were "mainly denominational" in content. We agree with the trial court that the demise of this kind of credit is to be prospective only so as not to jeopardize the standing for purposes of graduation or college entry of the students who have heretofore been permitted to satisfy these requirements by the courses in question. In approving this portion of the judgment we do not prohibit or require the state to recognize for purposes of "elective credit" any released-time classes which are available to all students on terms that do not require any test for religious content.
 
 
 55
 "Credit" is also used to measure satisfaction of the general compulsory school attendance requirement-that is, the daily and annual hours a student is required to be in the custody of an educational institution. For our purposes we refer to this kind of "credit" as "custodial credit." State statute provides that:
 
 
 56
 Every ... person having control of any minor between six and eighteen years of age shall be required to send such minor to a public or regularly established private school during the regularly established school year of the district in which he resides ....
 
 
 57
 Utah Code Ann. § 53-24-1. The state and school officials have an interest in insuring that students are not drifting about unsupervised during the hours that school is open. The Logan schools are open seven hours each school day. In the junior high school each student is required to be enrolled in and attend seven classes per day. The record does not reflect whether students in the senior high school are required by law or regulation to enroll in and attend a particular number of classes each school day. Defendants permit one hour each day of "custodial credit" to be satisfied by enrollment in a released-time course. For purposes of "custodial credit," apparently no consideration is given to whether the released-time course is religious or non-religious in content.
 
 
 58
 The granting of "credit" for this custodial purpose does not offend the Constitution in the released-time context any more than it does in the context of full-time private religious schools. It neither encourages nor discourages religion any more than similar recognition for attendance at full-time church-sponsored schools. It does not require public officials to entangle themselves in supervising course content any more than does recognizing attendance at private religious schools. Indeed, granting "custodial credit" is nothing more than permitting a released-time program, which was directly approved in Zorach.
 
 
 59
 The senior high school also requires six "credit" hours per day in order for a student to be eligible for extracurricular activities and to be a candidate for the school's honor roll. We refer to this kind of credit as "eligibility credit." Just as in the case of "custodial credit" and "elective credit," the hours spent in lawful released-time classes may be recognized for this purpose so long as no test of religious content is employed. In this case the school apparently permits released-time classes to satisfy "eligibility credit" without regard to whether it considers them "mainly denominational" or not. Since this practice requires no state involvement not inherent in Zorach -approved released-time, it does not offend the Constitution. From an entanglement perspective, this practice is no different from recognizing attendance at released-time classes as satisfying minimum daily attendance requirements for "custodial credit" purposes.
 
 
 60
 Finally, "credit" is used to measure the school's eligibility for state financial aid. This eligibility is based on daily pupil attendance. A school can receive funding for a particular pupil only if the student has attended at least four class periods of the day. Apparently, an hour spent in a released-time course is counted as an hour in attendance for purposes of measuring the district's eligibility for these state grants. None of these grant funds go to the released-time institutions. The funds do not in any way support or enhance the released-time classes. If giving "funding credit" for attendance at released-time classes in allocating state subsidies has any effect, its sole effect is to increase funds available to the public schools. While the practice may assist the public schools, it neither enhances nor inhibits the church-sponsored released-time courses. States may constitutionally allocate subsidies to their own subdivisions on the basis of total population, total student population, attendance in classes they conduct themselves, or attendance in all lawful educational programs including full-time private classes or released-time classes. While they may not award those funds to church-related schools or assist them except under narrowly limited circumstances, see, e. g., Committee for Public Education & Religious Liberty v. Regan, 444 U.S. 646, 100 S.Ct. 840, 63 L.Ed.2d 94 (1980); Tilton v. Richardson, 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971), no financial assistance has occurred here. Therefore, to the extent that the district court's order enjoins the counting of released-time attendance in measuring eligibility for state funds, it is reversed.
 
 VI. Attorney's Fees
 
 61
 The district court dismissed the only count of plaintiffs' complaint that alleged violations of 42 U.S.C. §§ 1981, 1983, and 1985. Plaintiffs have not appealed this dismissal or briefed us as to why this dismissal was improper. 42 U.S.C. § 1988 grants attorney's fees only when a party prevails "(i)n any action or proceeding to enforce a provision of sections 1981, 1982, 1983, 1985 and 1986." Additionally, we can perceive no nonstatutory basis for an award of attorney's fees in this case. See Alyeska Pipeline Service Co. v. Wilderness Society, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). Plaintiffs' claim for attorney's fees was therefore properly denied. Under the circumstances of this case, we also believe that the district court did not abuse its discretion in denying defendants' request for attorneys' fees. See Christiansburg Garment Co. v. Equal Employment Opportunity Commission, 434 U.S. 412, 98 S.Ct. 694, 54 L.Ed.2d 648 (1977).
 
 VII. Conclusion
 
 62
 The district court's judgment is affirmed insofar as it holds unconstitutional defendants' procedure of having public school students pick up attendance slips from released-time courses. The district court is reversed insofar as it holds the public school's preparation and provision of the attendance slips to the released-time courses unconstitutional. As pertaining to "credit," the district court's judgment is affirmed insofar as it enjoins defendants' system for granting "elective credit." The district court is reversed insofar as it holds unconstitutional the neutral granting of "custodial," "eligibility," and "funding" credit.
 
 
 63
 All other aspects of the district court's judgment are affirmed.
 
 ON REHEARING
 
 64
 McKAY, Circuit Judge.
 
 
 65
 Upon plaintiffs' petition for rehearing, we have reconsidered our decision with reference to an award of attorneys' fees. Notwithstanding the trial court's dismissal of Count Five of plaintiffs' complaint, it is apparent that the action as tried was premised on remedies afforded pursuant to 42 U.S.C. § 1983. The jurisdictional paragraph of plaintiffs' complaint made clear that the action was brought under § 1983. It is clear that § 1983 is the proper remedy to enjoin state action alleged to violate the First Amendment of the United States Constitution.
 
 
 66
 The Civil Rights Attorneys' Fees Awards Act of 1976, 42 U.S.C. § 1988, permits the court to award attorneys' fees to a prevailing party in an action brought under § 1983. Therefore, it was proper for the district court to consider an award of attorneys' fees under § 1988. It appears, however, that the district court applied an incorrect standard in determining whether plaintiffs were prevailing parties within the meaning of § l988. We therefore revise our prior opinion to include in the remand order a direction to reconsider this issue in light of our opinion in Gurule v. Wilson, 635 F.2d 782 (10th Cir. 1980).
 
 
 
 [1]
 Everson v. Board of Education, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947) (establishment clause); Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940) (free exercise clause)
 
 
 [2]
 The movement for universal education ... came ... in the nineteenth century. At the beginning these undertakings by the states were limited to schooling on the most elementary levels of reading, writing, and arithmetic (plus the inculcation of Christian dogma). Today, we have reached the stage where public institutions predominate even in the realm of graduate and professional education. Gradually, but long since established, came the notion that education should not only be made available to the citizenry but that at least some part of it should be compulsory. Education became not only the privilege of the young American, it also became his duty. Additionally, the period during which such education was to be compulsory has become longer and longer
 Kurland, The Supreme Court, Compulsory Education, and the First Amendment's Religion Clauses, 75 W.Va.L.Rev. 213, 214 (1973).
 
 
 [3]
 The phrase has its origin in the writings of Thomas Jefferson. See Reynolds v. United States, 98 U.S. 145, 164, 25 L.Ed. 244 (1878)
 
 
 [4]
 While Pierce was apparently decided on substantive due process grounds rather than the free exercise clause, Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), suggests that the free exercise clause leads to the same result
 
 
 [5]
 See Committee for Public Education and Religious Liberty v. Regan, 444 U.S. 646, 100 S.Ct. 840, 63 L.Ed.2d 94 (1980) (permitting use of public funds to reimburse church-sponsored schools for performing state-mandated testing, reporting, and recordkeeping services); Roemer v. Board of Public Works, 426 U.S. 736, 96 S.Ct. 2337, 49 L.Ed.2d 179 (1976) (permitting grants to private colleges, including religious colleges, subject to the restriction that the funds not be used for sectarian purposes); Hunt v. McNair, 413 U.S. 734, 93 S.Ct. 2868, 37 L.Ed.2d 923 (1973) (permitting state financing transaction involving the issuance of revenue bonds benefiting a church-sponsored college); Tilton v. Richardson, 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971) (permitting federal construction grants to private colleges, including religious colleges, so long as the grants are not for facilities used for sectarian instruction or religious worship); Board of Education v. Allen, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968) (permitting the state to lend textbooks free of charge to all students in grades seven to twelve, including students in private religious schools); Everson v. Board of Education, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947) (permitting reimbursement to parents of fares paid for transportation of children on public busses to public and parochial schools)
 
 
 [6]
 See Sloan v. Lemon, 413 U.S. 825, 93 S.Ct. 2982, 37 L.Ed.2d 939 (1973) (declaring unconstitutional reimbursement to parents for tuition for nonpublic schools); Committee for Public Education & Religious Liberty v. Nyquist, 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973) (declaring unconstitutional New York laws which provided for maintenance and repair grants and for tuition reimbursement and tax benefits to parents); Levitt v. Committee for Public Education & Religious Liberty, 413 U.S. 472, 93 S.Ct. 2814, 37 L.Ed.2d 736 (1973) (declaring unconstitutional state reimbursement to private schools for certain costs of testing and record keeping); Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971) (declaring unconstitutional state salary supplement to nonpublic school teachers and state reimbursement to nonpublic schools for the cost of teachers' salaries, textbooks, and instructional materials)
 
 
 [7]
 See Epperson v. Arkansas, 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968) (holding unconstitutional a state statute prohibiting the teaching of evolution in the public schools)
 
 
 [8]
 As far as this record reflects, it makes no difference to the outcome of this case whether this action was certified as a class action or not. There is no claim that the named plaintiffs did not have standing, and no suggestion of mootness appears from the record
 
 
 [9]
 See Choper, Religion in the Public Schools: A Proposed Constitutional Standard, 47 Minn.L.Rev. 329 (1963); Kurland, The Supreme Court, Compulsory Education, and the First Amendment's Religion Clauses, 75 W.Va.L.Rev. 213 (1973); Louisell, Does the Constitution Require a Purely Secular Society?, 26 Cath.L.Rev. 20 (1976); Meiklejohn, Religion in the Burger Court: The Heritage of Mr. Justice Black, 10 Ind.L.Rev. 645 (1977); Pfeffer, Freedom and/or Separation: The Constitutional Dilemma of the First Amendment, 64 Minn.L.Rev. 561 (1980); Toscano, A Dubious Neutrality: The Establishment of Secularism in the Public Schools, 1979 B.Y.U.L.Rev. 177; Note, The "Released Time" Cases Revisited: A Study of Group Decisionmaking by the Supreme Court, 83 Yale L.J. 1202 (1974)
 
 
 [10]
 In shaping the modern tripartite test, the Court has not rejected its early Religion Clauses cases, but instead has purported to distill them
 In Meek v. Pittenger, 421 U.S. 349, at 358, 95 S.Ct. 1753, 1760, 44 L.Ed.2d 217 (1975), the Court said the three tests "constitute a convenient, accurate distillation of this Court's efforts over the past decades to evaluate a wide range of governmental action challenged as violative of the constitutional prohibition against laws 'respecting an establishment of religion,' and thus provide the proper framework of analysis for the issues presented in the case before us."
 In Committee for Public Education & Religious Liberty v. Nyquist, 413 U.S. 756, 772, 93 S.Ct. 2955, 2965, 37 L.Ed.2d 948 (1973), the Court said "the now well-defined three-part test that has emerged from our decisions is a product of considerations derived from the full sweep of the Establishment Clause cases."
 Smith v. Smith, 523 F.2d 121, 123 & n.5 (4th Cir. 1975), cert. denied, 423 U.S. 1073, 96 S.Ct. 856, 47 L.Ed.2d 83 (1976).
 
 
 [11]
 The trial court found that
 (a)dmittedly, the Defendant boards have not engaged in any overseeing of the Old Testament and New Testament classes and have thus far avoided the possible entanglements. In fact, they have granted credit for such courses upon presentation of certified transcripts, without inquiry of any kind relative to the course content.
 
 
 [463]
 F.Supp. at 881. The Utah Board of Education's policy statement on its face seems to require such monitoring, however, and therefore violates the entanglement prong of the Lemon test
 
 
 [12]
 It is of course unavoidable that the state must supervise the content of courses in public schools to insure that it is not sponsoring religion in its own classrooms. It lacks the same power to supervise content when churches teach courses because of the entanglement of public officials with church-sponsored institutions that such supervision necessarily entails